## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SHELANDA GOODMAN-THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO.: 1:13-CV-1037 |
| EMORY HEALTHCARE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant Emory Healthcare, Inc. (incorrectly denominated in the Complaint as "Emory Healthcare") ("EHC" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, and hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.

## I.     INTRODUCTION

Despite a litany of well-documented disciplinary actions and admitted violations of critical company policies that resulted in her progressive discipline and termination, Plaintiff filed this race discrimination and retaliation action against her former employer, EHC.  EHC is a healthcare organization that has a legal and ethical obligation to protect the confidentiality of its patients' medical information and to prevent the unauthorized practice of medicine.  Plaintiff, who has no medical training, was terminated from one of Defendant's call centers after she gave medical advice to a

patient and disclosed the patient's medical information without authorization. Plaintiff's termination for this egregious (and potentially criminal) violation of federal and state law and company policy followed a long history of prior disciplinary actions, including a prior violation of EHC's patient privacy policies and repeated complaints from multiple co-workers and supervisors regarding behavioral deficiencies that she failed to improve. During her deposition, Plaintiff disagreed with the substantive criticism of her behavior on every occasion; however, she acknowledged the issues raised in each complaint and in the written discipline she received, and she did not dispute that EHC's management in fact received these numerous complaints.  Plaintiff has also failed to present any evidence that EHC's reasons for disciplining her and terminating her employment were pretextual.  Based on this record of undisputed material facts, EHC is entitled to summary judgment on each of Plaintiff's claims.

## II.   STATEMENT OF FACTS

### A.   Emory Healthcare, Inc.'s Operations And Obligation To Comply With Patient Privacy Laws.

Emory Healthcare, Inc. ("EHC") operates one of the country's leading comprehensive health care systems.  The system is comprised of preeminent teaching programs, research facilities and full-service hospitals and clinics, including The Emory Clinic's Winship Cancer Institute ("WCI").  (Declaration of Stephanie D. Shuler (hereinafter "Shuler Dec.") ¶ 3, attached hereto as Exhibit 1).

2

As a healthcare institution, EHC is a covered entity under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and all of its interpreting regulations such as The Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule").[1]  (Id.).  In order to comply with HIPAA, EHC has maintained and promulgated a HIPAA Compliance Policy which limits employees' access, use, and disclosure of patients' protected health information ("PHI") to the minimum amount necessary to perform their job duties.  (Shuler Dec. ¶ 4).  For example, nurses and physicians are generally permitted to access and use all of a patient's PHI if they are directly involved in patient care.  Administrative employees, such as patient registration clerks, however, are only permitted to access and use the PHI necessary to schedule a patient appointment.  (Id.)  EHC's HIPAA Compliance Policy is strictly enforced and even a single violation subjects an employee to termination and possible criminal prosecution.  (See Deposition of Plaintiff Shelanda Goodman-Thomas (hereinafter "Pl. Dep.") at Ex. 8; Shuler Dec. ¶ 4).

EHC provides all new employees with extensive training on HIPAA and EHC's HIPAA Compliance Policy and requires all employees to complete compliance

---

[1]  The Privacy Rule defines and limits the circumstances in which an individual's PHI may be used or disclosed by covered entities.  A covered entity may not use or disclose PHI except as the Privacy Rule permits or as the individual who is the subject of the information (or the individual's personal representative) authorizes in writing.  The Privacy Rule also requires a covered entity to develop and implement policies and procedures to reasonably limit uses and disclosures to the minimum necessary.  42 CFR §164.501

training on an annual basis.  (Shuler Dec. ¶ 5).  To further ensure the confidentiality of patient information, EHC requires all employees to sign a Confidentiality Statement indicating that they have read and agree to abide by EHC's Confidentiality Policy and understand that their failure to comply with the policy is grounds for immediate termination and criminal prosecution.  (Id.; Pl. Dep. Ex. 4, p.2).

> **B.**     **EHC's Equal Employment, Progressive Discipline And Employee Grievance Policies.**

EHC maintains and enforces a strong policy against unlawful employment discrimination and harassment which contains procedures and directions for reporting complaints and forbids any type of retaliation for reporting complaints.  (Shuler Dec. ¶ 5).  EHC also maintains a progressive, corrective disciplinary policy which is designed to promote employee success by giving each employee clear notice of the aspect(s) of his or her job performance or conduct that are unacceptable and need to be improved upon.  (Id. at ¶ 7).  The policy provides that initial employee discipline will be in the form of a verbal discussion and that any subsequent disciplinary action, i.e., a written warning, final written warning or termination, may be imposed by management, regardless of whether prior discipline has been issued when it is appropriate to address the employee's unacceptable work performance or policy violation.  (Id.).  In order to ensure the fairness of all disciplinary actions imposed on employees, EHC has established a grievance policy that permits employee to appeal any disciplinary action taken against them.  (Id. at ¶ 7).

C.    **Plaintiff's Employment With EHC.**

EHC hired Plaintiff, who is African-American, in January 2008 as a Patient

Services Coordinator in The Emory Clinic's Ophthalmology Department.  (Pl. Dep.

53).  Plaintiff received Defendant's policies pertaining to equal employment, patient

confidentiality, progressive discipline and HIPAA.  (Id. at 62-64; Ex. 8).  Shortly after

her hire, EHC provided training to Plaintiff regarding the HIPAA Compliance Policy.

(Shuler Dec. ¶¶ 11-12; Ex. I).  Plaintiff also successfully completed EHC's mandatory

annual Corporate Compliance and HIPAA training in 2008, 2009 and 2010.  (Id.).

In July 2010, Susan Bergen, WCI's Call Center Manager, hired Plaintiff for an

internal promotion as a PSC II ("PSC") at WCI.  (Declaration of Susan Bergen

(hereinafter "Bergen Dec.") ¶ 4, attached hereto as Exhibit 2).  The PSC position is a

non-clinical, administrative role which requires the employee to answer the phone,

schedule and reschedule appointments for current patients, register new patients and

forward patient questions and messages to clinical staff.  (Id. at ¶ 5; Pl. Dep. 57-59).

In order to schedule appointments, PSCs access EHC's internal data system which

includes the patient's date of birth, address, appointment history, insurance carrier and

billing information.  (Id.).  EHC permits PSCs to access a patient's Electronic Medical

Record ("EMR") for the sole purpose of entering data into a patient's record so that the

clinical staff can review the data.  (Id.)  In order to register new patients, PSCs working

in the WCI Call Center must obtain several pieces of PHI, such as the type of cancer

diagnosis and information pertaining to medical tests already performed.  (Id.)  In order to ensure that PSCs request only the minimal amount of PHI necessary to perform their job duties, EHC requires PSCs to follow a detailed script and to enter patient responses verbatim into the EMR.  (Id.).  PSCs who receive calls from patients who have questions concerning their medical diagnosis or treatment or have issues requiring the review or interpretation of PHI, are required to forward these issues to the medical staff.  (Id.).  PSCs are strictly prohibited from answering any patient questions that require the review or interpretation of PHI since they have no medical training and are therefore not authorized to participate in the patient's medical treatment. (Bergen Dec. ¶ 5).  In order to ensure call quality and compliance with all applicable policies, WCI records and monitors all inbound calls processed by PSCs.  (Id. at ¶ 14; Pl. Dep. 35).

### D.   Plaintiff's Multiple Displays Of Confrontational And Aggressive Behavior.

On July 26, 2010, Plaintiff began working in the WCI Call Center ("Call Center") where she reported to Ms. Bergen and Joan Giblin, WCI Call Center Director. (Id. at ¶ 4).  Plaintiff also reported to Call Center Supervisor Yalonda Garrick (African-American) on days when Ms. Bergen has to work outside of the WCI Call Center.  (Id. at  ¶ 10; Pl. Dep. 92).  Plaintiff had only worked in the Call Center for approximately two weeks when, by her own admission, she initiated an argument with Stephanie Christopolous, a senior member of the Call Center team.  (Docket No. 3; ¶

6

8).  Several months later, Stephanie Gardner, an African-American Call Center

supervisor, made a complaint to Ms. Bergen about Plaintiff's disruptive behavior and

comments which resulted in Ms. Bergen and Ms. Giblin issuing Plaintiff a verbal

warning on December 20, 2010.  (Bergen Dec. ¶ 6; Pl. Dep. 75-77; Ex. 12).  Ms.

Bergen met with Plaintiff to present her with the warning and counseled her regarding

the importance of professional workplace behavior and the negative consequences of

her behavior.  (Bergen Dec. ¶ 6; Pl. Dep. ). Plaintiff acknowledged the unacceptable

nature of her conduct and indicated that she understood that similar incidents would

result in a Written Warning.[2]  (Bergen Dec. ¶ 6; Pl. Dep.; Ex. 12).

    Although Plaintiff was well aware of the consequences of her failure to improve

her conduct toward her co-workers and management, Plaintiff continued to display a

confrontational and belligerent attitude at work.  On March 11, 2011, Plaintiff accosted

Charlene Brown, an African-American Finance Manager, in order to find out why

another person received a job for which she applied.  (Bergen Dec. ¶ 6; Ex. E; Pl. Dep.

78).  Plaintiff became very angry and refused to leave Ms. Brown's desk, demanding

to know why the successful applicant was hired when "he doesn't know nothing."

---

[2]  This was not the first time Plaintiff had been disciplined for her misconduct.
On March 22, 2010, Mr. Larson issued Plaintiff a verbal warning for her unacceptable
conduct, which included making multiple personal phone calls during working hours
in the presence of patients and attending to her personal financial business in his
presence.  Mr. Larson met with Charging Party to provide her with the warning and
counsel her regarding the need to refrain from personal calls and focus her attention on
providing excellent customer service to patients.  (Pl. Dep. 67; Ex. 10).

(Bergen Dec. ¶ 6; Ex. E).  Ms. Brown contacted Ms. Bergen to report Plaintiff's aggressive and inappropriate behavior which left her concerned about her personal safety.  (Id. at ¶ 7).

Ms. Bergen investigated the issue with the assistance of EHC's Human Resources Director Mark Eddington and they determined that Plaintiff's behavior warranted a Written Warning.  (Id.).  On April 1, 2011, Ms. Bergen met with Plaintiff to present her the Written Warning in order to give her clear notice of EHC's expectation that she must immediately remediate her behavior in order to avoid termination.  (Id. at ¶ 8).  In order to help her improve her interpersonal skills, Ms. Bergen referred Plaintiff to an EHC-sponsored employee communications class on April 18, 2011.  (Id.).

Despite Ms. Bergen's efforts to remediate Plaintiff's conduct, Plaintiff's aggressive and confrontational behavior persisted.  For example, on or about May 25, 2011, Plaintiff left her work station in order to fraternize with a co-worker in another department where an employee-recognition breakfast was taking place.  (Bergen Dec. ¶ 9; Pl. Dep.; Ex. 13).  Plaintiff was angry that an employee in another department loudly informed her in front of several other people that she was not allowed to eat the breakfast because it was for employees in another department.  (Id.).  Upon returning to her desk, Ms. Plaintiff sent an inappropriate e-mail expressing her displeasure with the encounter that was perceived by its recipient as aggressive because of the subject

8

line stating "Incitement This Morning" and because Plaintiff sent the e-mail to the wrong person.  (Id.).  Despite this inappropriate behavior and display of poor judgment, Ms. Bergen chose not to issue Plaintiff formal discipline and instead verbally counseled her about the need to avoid confrontations with her co-workers and the need to involve me if she was unsure of how to handle a situation.  (Bergen Dec. ¶ 9).

On June 14, 2011, Ms. Bergen received a call from Plaintiff informing her that she had shouted for Ms. Garrick's assistance for help with an issue but that Ms. Garrick refused to help her.  (Bergen Dec. ¶ 10; Pl. Dep. 92-93).  After speaking with Ms. Garrick, Ms. Bergen learned that the reason she could not immediately respond to Plaintiff was because she was attending to a sick call center employees who fainted and was taken to the emergency room.  (Id.).  Ms. Bergen then asked Plaintiff to provide a written account of what happened yet she inexplicably refused and instead chose to raise the issue of Ms. Garrick's perceived rudeness to supervisors outside of her department.  (Id.).

Ms. Garrick and Ms. Bergen consulted with EHC Human Resources Generalist, Stephanie Shuler, who is African-American, about Plaintiff's failure to improve her long history of misconduct and her poor interpersonal skills, and they collectively decided to issue Plaintiff a Final Warning.  (Shuler Dec. ¶1, 14; Bergen Dec. ¶ 11).  On June 29, 2011, Ms. Shuler, Ms. Garrick and Ms. Bergen met with Plaintiff to present

her with the Final Warning in order to give her clear notice that any further instances of misconduct would result in her immediate termination.  (Shuler Dec. ¶ 14; Bergen Dec. ¶ 12; Pl. Dep. 94).  They also directed Plaintiff to prepare a personal development plan for improving her interactions with her co-workers and managers that would be monitored on a regular basis by Ms. Garrick and Ms. Bergen.  (Shuler Dec. ¶ 14; Bergen Dec. ¶ 12).  During this meeting, Plaintiff disagreed with management's decision to issue a Final Written Warning, but she did not dispute that she had engaged in the conduct that led to the decision.  (Id.).  Plaintiff prepared a written action plan in which she acknowledged her need to avoid "pointless confrontations."[3]  (Pl. Dep. Ex. 14).

On August 19, 2011, Plaintiff contacted EHC's Compliance Department regarding her concerns that Ms. Bergen was treating her unfairly by issuing her the written discipline for unwarranted and minor issues.  (Shuler Dec. ¶ 15; Ex. K). Plaintiff also raised concerns that Ms. Shuler was not listening to her account of the events that led to her Final Written Warning.  (Id.).  Notably, Plaintiff's complaint was devoid of any reference to race or discrimination.  Plaintiff's Final Written Warning was upheld after several members of EHC's management personally met with Plaintiff

---

[3] During her deposition, Plaintiff defined this term as "confrontations with anybody that make no sense" and candidly admitted that she had initiated several "pointless confrontations" for which Ms. Bergen did not discipline her.  (Pl. Dep. 95-97).

10

to listen to her concerns and investigate her complaint.  (Pl. Dep. 111-12; Ex. 16).

During one such meeting with  WCI's Director of Operations and Mr. Eddington,

Plaintiff became angry and told Mr. Eddington to "step off" before abruptly leaving

the room because she did not agree with him.  (Pl. Dep. 111-12; Ex. 17).

      **E.**    **Plaintiff's Consecutive Violations Of The HIPAA Privacy Rule and
EHC's HIPAA Compliance And Confidentiality Policies.**

On September 10, 2011, Stephanie Gardner, Patient Call Center Supervisor,

(African-American) complained to Ms. Bergen regarding Plaintiff's behavior towards

two of Ms. Gardner's direct reports, when they were unable to schedule an

appointment with an Ophthalmologist for one of Plaintiff's relatives.  (Bergen Dec. ¶

13; Ex. G; Pl. Dep.104-05).  After speaking with Plaintiff, Ms. Bergen ultimately sided

with Plaintiff and concluded that she did not act inappropriately towards her co-

workers.  (Bergen Dec. ¶ 13).  Ms. Bergen's conversation with Plaintiff, however, left

her concerned that Plaintiff may have accessed her relative's EMR and viewed the

physician's patient notes since EHC's HIPAA Compliance Policy forbids employees

from accessing a family member's chart (or even their own chart) unless it is necessary

to perform their job duties.  (Id.; Pl. Dep.; Exs 8 (EHC Compliance Manual); and 9, p.

14-15).  Ms. Bergen consulted with Ms. Schuler who obtained a report from EHC's

Information Technology Department that indicated that Plaintiff had accessed her

relative's chart several months earlier in April 2011.  (Id.).  Although Plaintiff was on

4838-8440-4248.1

a Final Written Warning and her blatant HIPAA Compliance Policy violation was alone grounds to terminate her employment since employees are not permitted to access family members or their own EHR, Ms. Bergen decided to give Plaintiff one more opportunity to maintain her employment.  Due to the severe nature of her policy violation, however, Ms. Bergen met with Plaintiff to reemphasize the importance of complying with EHC's HIPAA Compliance Policy by only accessing the PHI necessary for her to perform her job duties.  (Id.).  During this meeting (and in deposition), Plaintiff admitted that she had accessed her relative's records.  (Id.; Pl. Dep. 105-06).  Ms. Bergen also informed Plaintiff that, regardless of her intentions or the patient's relationship to her, accessing her relative's EMR constituted a HIPAA violation because she did not access it for job-related reasons since performing favors for her friends and relatives was not job-related.  (Bergen Dec. ¶ 13; Pl. Dep. Ex. 15). Plaintiff indicated that she understood and that she was aware that any further violations would result in her termination.  (Id.).

Several months after Plaintiff's deliberate access of PHI that was not required to perform her job duties, Plaintiff again violated the HIPAA Privacy Rule and EHC's policies.  On or about February 15, 2012, WCI Call Center Manager Elizabeth Martin gave Ms. Bergen and Ms. Shuler recordings of several calls conducted by Plaintiff that were flagged after one of Plaintiff's African-American co-workers raised a concern that Plaintiff was providing medical advice to callers.  (Shuler Dec. ¶ 18, Bergen Dec.

¶ 14; P. Dep. 132).  After listening to the recordings, Ms. Shuler and Ms. Bergen determined that Plaintiff reviewed and interpreted patient medical records and provided medical advice to a patient in violation of EHC policy.  (Id.).  They also determined that Plaintiff later disclosed the patient's PHI to a caller who purported to be the patient's daughter, even though Plaintiff failed to secure the patient's written consent and made no effort to determine the identity of the caller. (Id.; Pl. Dep. 119-20).

Ms. Shuler, Ms. Martin, and Ms. Bergen met with Plaintiff that day to discuss her policy violations.  (Shuler Dec. ¶ 19; Bergen Dec. ¶ 15).  During this meeting, Plaintiff admitted:  (1) accessing and disclosing PHI without written authorization and (2) providing medical advice to the patient.  (Id.).  Based on the recordings of Plaintiff's calls and her policy violation admissions, Ms. Shuler and Ms. Bergen made the decision to terminate Plaintiff's employment.  (Id.).  Plaintiff was notified of this decision on February 22, 2012.  (Id.).

On March 2, 2012, EHC received Plaintiff's Charge filed with the U.S. Equal Employment Opportunity Commission.  (Pl. Dep.; Ex. 18).  The facts in the charge pertained exclusively to her June 29, 2011 Final Written Warning and her belief that it was the result of race discrimination and retaliation for submitting an internal complaint to Ms. Bergen nearly a year earlier in July 2010.  (Id.).  Plaintiff later amended her Charge only to allege that her termination was the result of race

4838-8440-4248.1

discrimination and retaliation for an internal complaint she raised in August 2011 concerning EHC's decision to issue her a Final Written Warning.  (Id. at Ex. 21).  The EEOC closed its investigation without finding that EHC had violated the law and issued Plaintiff a Right-To-Sue Notice.  (Id).

On April 2, 2013, Plaintiff filed suit under Title VII of the Civil Rights Act of 1964, as amended, contending that Defendant discriminated against her because of her race (African-American) and religion (unidentified) by issuing her a Final Written Warning in June 2011 and later terminating her employment.  (Docket No. 3).  Plaintiff also contends that her termination was in retaliation for having challenged the fairness of her Written Warning over six months earlier in August 2011 and due to her argument with Ms. Christopolous in July 2010.[4]  (Id.).  The Court granted Plaintiff's "Motion To Dismiss Religious Discrimination From Complaint" on November 1, 2013.  (Docket No. 28).  Plaintiff's race discrimination and retaliation claims remain.

---

[4] Plaintiff also appears that allege that a white female was "the first to get promoted to medical secretary" when Plaintiff was hired in 2007 in the Ophthalmology Department.  (Docket No. 3).  This claim, however, was not part of Plaintiff's Charge and is clearly time-barred.  Because Plaintiff failed to exhaust her administrative remedies with respect to this claim, Defendant is entitled to summary judgment.  See Anderson v. Embarq/Sprint, 379 Fed. Appx. 924  (11th Cir. 2010) (affirming dismissal of Plaintiff's claims that were not timely raised in an EEOC charge).

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   The Summary Judgment Standard.

Summary judgment is proper when no genuine issue as to any material fact is present and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Initially, the movant carries the burden and must show that there is "an absence of evidence to support a non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1996).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-movant is required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324.  Summary judgment rulings in favor of defendants are not rare in employment discrimination cases.  Earley v. Champion Intern Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "In an employment discrimination case, the Plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion."  Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997).

4838-8440-4248.1

**B.**     **Plaintiff's Discriminatory and Retaliatory Termination Claims Fail As A Matter of Law.**

In discrimination and retaliation cases under Title VII, courts follow the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green.  McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973); Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255 (11th Cir. 2007).  A plaintiff must first establish a prima facie case of discrimination.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).  If the plaintiff succeeds, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision.  See Chapman v. A1 Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).  Once the defendant satisfies this burden, any presumption of discrimination arising out of the prima facie case "drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000).

**1.**     **Plaintiff Cannot Establish A Prima Facie Case of Discriminatory Termination.**

In order to establish a discriminatory termination claim based on race, a plaintiff to demonstrate that: (1) she was a member of a class of persons protected by the statute; (2) she was qualified for the position from which she was discharged; (3) she was terminated; and (4) following her discharge, the defendant replaced plaintiff with

someone outside her protected class.  See, e.g., Jones v. Bessemer Carraway Med. Ctr,

137 F.3d 1306, 1311 n.6 (11th Cir. 1998).[5]  Although Plaintiff is African-American

and was terminated by EHC, Plaintiff cannot establish a prima facie case because it is

undisputed that Plaintiff was replaced by an employee in the same protected class.

(Bergen Dec. ¶ 16; Pl. Dep. 128)

### 2.   Plaintiff Cannot Establish A Prima Facie Case of Retaliatory Termination.

To establish a prima facie case of retaliation, the plaintiff must show that:  (1)

she engaged in statutorily protected activity; (2) she experienced an adverse

employment action; and (3) there is a causal connection between the protected activity

and the adverse action.  Hulbert v. St. Mary's Healthcare Sys., Inc., 439 F.3d 1286,

1297 (11th Cir. 2006).  Evidence of an employer's concerns about an employee's

performance before the employee's protected activity undercuts a finding of causation.

Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006).  Moreover, the causality

element is only satisfied where the plaintiff shows a "close temporal proximity"

between the protected activity and the adverse action.  Higdon v. Jackson, 393 F.3d

1211, 1220 (11th Cir. 2004).

---

[5] While a prima facie case may also be established by showing that similarly-situated employees outside of the protected class were treated more favorably, Plaintiff has presented no evidence that white employees violated the HIPAA Privacy Rule and EHC's patient privacy policies and were not terminated.

Plaintiff's prima facie case fails because she did not engage in any protected activity prior to her termination, since it is undisputed that her complaint to the Compliance Department did not contain any reference to race or racial discrimination. See Brown v. City of Opelika, 211 Fed. Appx. 862, 863-64 (11th Cir. 2006) (affirming summary adjudication of plaintiff's Title VII retaliation claim and finding that plaintiff did not engage in protected activity because there was no evidence that, when making her complaint, the employee referred to "racial discrimination or harassment" or "mentioned the word 'race'); Jeronimus v. Polk County Opportunity Council, 145 Fed. Appx. 319, 326 (11th Cir. 2005) (plaintiff did not engage in Title VII protected activity when he complained of being "singled out" and being subjected to "harassment" and a "hostile environment" because plaintiff did not "suggest" that his "treatment was in any way related to his race or sex").

Plaintiff also cannot establish a prima facie case of retaliation because she cannot demonstrate a causal connection between any statutorily protected activity and her termination.  Notably, there is no temporal proximity because over six months passed between her complaint to the Compliance Department on August 11, 2011 and her termination on February 23, 2012.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 273-274 (stating that a three to four month interval is insufficient to establish a causal connection in a retaliation case); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) (finding that three and one-half month proximity between a protected activity

18

and an adverse employment action is insufficient to create a jury issue on causation).

Moreover, Plaintiff cannot establish the causal connection element because she

engaged in multiple confrontations and instances of misconduct which resulted in her

receiving multiple verbal counselings, two verbal warnings, one written warning and

one final written warning prior to her complaint to EHC's Compliance Department in

August 2011.  (Shuler Dec. ¶ 13).

### 3. Defendant's Legitimate, Non-Discriminatory And Non-Retaliatory Reason For Plaintiff's Termination.

Defendant has clearly articulated a legitimate, non-discriminatory and non-

retaliatory reason for terminating Plaintiff's employment inasmuch as it is undisputed

that Defendant terminated Plaintiff's employment(after a long history of discipline) for

providing unauthorized medical advice to a patient over the telephone and violating the

HIPAA Privacy Rule and EHC's confidentiality policies by accessing and disclosing

patient PHI.  (Bergen Dec. ¶¶ 14-15; Shuler Dec. ¶¶ 18-19).

### 4. Plaintiff Cannot Establish That Defendant's Legitimate, Non-Discriminatory Reasons Are A Pretext For Race Discrimination Or Retaliation.

Even if Plaintiff could establish a prima facie case (which she cannot), her

discriminatory and retaliatory termination claims would still fail because she cannot

show that Defendant's proffered legitimate, non-discriminatory and non-retaliatory

reasons for her termination are pretextual.  "Pretext means more than a mistake on the

part of the employer; pretext means a lie, specifically a phony reason for some action."

19

Tolley v. United Parcel Serv., No. Civ.A.1:05CV606TWT, 2006 U.S. Dist. LEXIS

10877, at *5 (N.D. Ga. Feb. 27, 2006).[6]  "Thus, the inquiry is limited to whether the

employer offered an honest, [non-discriminatory and non-retaliatory] explanation for

terminating the employee, regardless of whether the decision might have been

mistaken." Id. That is, "[a]n employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its action is

not for a discriminatory [or retaliatory] reason." Nix v. WLCY Radio Comm., 738 F.

2d 1181, 1187 (11th. Cir. 1984).  "A reason is not pretext unless the plaintiff shows

that it is false, and that discrimination [or retaliation] was the real reason." Castillo v.

Roche Labs., Inc., 467 Fed. Appx. 859, 863 (11th Cir. 2012). "Ultimately, an

employee must meet the employer's stated reason 'head on and rebut it, and [she]

cannot succeed by simply quarreling with the wisdom of that reason.'" Id.

    Here, Plaintiff cannot establish pretext because she admitted in her deposition

that she accessed her family member's medical chart in violation of HIPAA and

EHC's confidentiality policy.  (Pl. Dep. 105-06).  Likewise, Plaintiff admitted that she

provided medical advice to a patient over the telephone and accessed and disclosed

that same patient's PHI without written authorization.  (Pl. Dep. 117-20).  Moreover, it

is undisputed that Plaintiff was the subject of multiple complaints (mostly initiated by

---

    [6] A copy of this unpublished decision is attached as Exhibit 3.

employees of her same race) which catalogued a litany of concerns, including

Plaintiff's initiating and engaging in inappropriate confrontations with co-workers,

lack of professionalism and good judgment and argumentative, defensive, and abrasive

behavior.  (Shuler Dec. ¶ 13; Ex. J; Bergen Dec. ¶¶ 6-10, 13; Pl. Dep. 95-98; Exs. 10,

12-14, 15).  Plaintiff also admitted that she was aware that she could be terminated for

any misbehavior or policy violation that occurred after she received the Final Written

Warning.  (Pl. Dep. 94).  She also admitted in deposition that she does not know what

factors were considered in making the decision to terminate her employment.  (Pl.

Dep. 126).  In fact, Plaintiff admitted that she does not know if her race or alleged

complaints were ever raised or discussed as a factor in the discharge decision.  (Id.).

Thus, Plaintiff <u>admits</u> that she cannot demonstrate pretext, and her discriminatory

termination claim fails as a matter of law.  Because Plaintiff is unable to show that

Defendant's reason for her termination was a pretext for discrimination or retaliation,

Defendant is entitled to summary judgment.  See <u>Willis v. Conopco, Inc.</u>, 108 F.3d

282, 287 (11th Cir. 1997) (affirming summary adjudication plaintiff's claims where

she failed to offer evidence to raise an inference that defendant's articulated

explanation for her termination was pretextual).

### C.   Plaintiff's Retaliation and Racial Discrimination Claims Premised On Her June 29, 2011 Final Written Warning Fail As A Matter of Law.

In her Charge, Plaintiff contends that her June 2011 Final Written Warning is

the product of race discrimination and retaliation for her alleged complaint to Ms.

4838-8440-4248.1

Bergen in July 2010.[7]  (Pl. Dep.; Exs. 18, 19).  As an initial matter, this claim fails as a matter of law because Plaintiff failed to timely exhaust her administrative remedies.  In a non-deferral jurisdiction, like Georgia, a charge of discrimination under Title VII must be filed within 180 days after the alleged adverse employment action.  See 42 U.S.C. § 2000e-5(e)(1).  Here, it is undisputed that Plaintiff received the Final Written Warning on June 29, 2011.  (Pl. Dep. Ex. 14).  Plaintiff did not file an EEOC Charge until 227 days later on February 11, 2012.  (Id. at Ex. 18).  Defendant is therefore entitled to summary judgment on this claim because Plaintiff did not timely file a Charge with respect to these claims and thus failed to exhaust her administrative remedies.  See Anderson v. Embarq/Sprint, 379 Fed. Appx. 924  (11th Cir. 2010) (affirming dismissal of plaintiff's claims that were not timely raised in an EEOC charge).

Defendant is also entitled to summary judgment because Plaintiff cannot demonstrate a prima facie case of race discrimination with respect to the Final Written Warning because it is undisputed that Ms. Bergen issued a Final Written Warning to a white Call Center employee.  (Bergen Dec. ¶ 18).  Plaintiff's prima facie case of retaliation based on this written reprimand is likewise doomed because the undisputed

---

[7]  In her Complaint, Plaintiff admitted that she was not retaliated against inasmuch as she alleges that Ms. Bergen imposed this discipline on her because she initiated an argument with Ms. Christopolous and Ms. Bergen and Ms. Christopolous are friends.  (Docket No. 3).

evidence shows that it was issued nearly a year after Plaintiff alleges she complained to Ms. Berger about her alleged favorable treatment of Ms. Christopolous.  (Pl. Dep. Exs. 14, 18).  Finally, Plaintiff cannot demonstrate that Ms. Bergen and Ms. Shuler's legitimate business decision to issue her a Final Written Warning pursuant to the Progressive Disciplinary Policy is a pretext for race discrimination or retaliation, because it is undisputed that EHC received multiple complaints from several sources (most of whom were members of Plaintiff's protected class) detailing instances of unacceptable workplace conduct, including making multiple personal phone calls during working hours in the presence of patients and her supervisor, insubordination, initiating multiple altercations with her co-workers and EHC management and displaying aggressive behavior which caused at least one victim to have serious concerns about her safety.  Plaintiff's denials of these criticisms do not demonstrate pretext because an employee's own perception of her performance is insufficient, and does not constitute affirmative evidence to demonstrate pretext.  See Nix 738 F. 2d 1181, 1187 (11th Cir. 1984) ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.").  Accordingly, Plaintiff has presented no evidence of pretext and Defendant is entitled to summary judgment on this claim.

## IV.   **CONCLUSION**

Based on all of the foregoing reasons, Defendant is entitled to summary judgment as to all of Plaintiff's claims.

Respectfully submitted, this 21st day of January, 2014.

Lewis Brisbois Bisgaard & Smith LLP

/s/    Toni J. Read
           John S. Snelling
           Georgia Bar No. 665759
           Toni J. Read
           Georgia Bar No. 140982

1180 Peachtree Street
Suite 2900
Atlanta, GA  30309
(404) 567-6588 (telephone)
(404) 467-8845 (facsimile)
Attorneys for Defendant
Emory Healthcare, Inc.

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel hereby certifies that this Memorandum of Law In Support of Defendant's Motion for Summary Judgment complies with the type-volume limitations set forth in Rule 5.1 of the Local Rules of the United States District Court for the Northern District of Georgia.  Counsel hereby states that this Memorandum of Law In Support of Defendant's Motion for Summary Judgment has been typed in Times New Roman 14 count.


/s/  Toni J. Read

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of January, 2014, I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system.  I also hereby certify that a true and exact copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served upon Plaintiff via first-class mail, postage prepaid, and addressed as follows:

> Shelanda Goodman-Thomas
> 2121 Golfview Drive, SE
> Conyers, GA 30013


> /s/     Toni J. Read                             
> Attorney for Defendant
> Emory Healthcare, Inc.